UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JENNIFER OUTING,

    Plaintiff,

vs.                                  Case No: _____

CITRUS WORLD, INC., d/b/a Florida's
Natural Growers, and FLORIDA'S
NATURAL GROWERS, INC.

    Defendants.
_____/

## COMPLAINT

NOW COMES Plaintiff Jennifer Outing ("Plaintiff" or "Ms. Outing"), by and through the undersigned counsel, and hereby brings this action against Defendants Citrus World, Inc. d/b/a Florida's Natural Growers ("CWI") and Florida's Natural Growers, Inc. ("FNG") (collectively, "Defendants"). Plaintiff alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff brings this action against Defendants for violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e), Section 1981 of the Civil Rights Act of 1866 (42 U.S.C. § 1981), the Florida Civil Rights Act, and the federal Family and Medical Leave Act (29 U.S.C. § 2601, *et seq.*).

2. Plaintiff is an African-American/Black woman who resides in Lake Wales, Florida. Plaintiff is a citizen of Florida.

3. Defendant CWI is a Florida corporation with its corporate headquarters in Lake Wales, Florida. It is owned by its members and grows and processes citrus products, which it markets under the name "Florida's Natural Growers."

4. Defendant Florida's Natural Growers, Inc. is a Florida corporation with its corporate headquarters in Lake Wales, Florida. CWI owns and operates Florida's Natural Growers, Inc. and it is a division of CWI.

5. Defendants are employers as defined by the statutes identified herein upon which Plaintiff's claims are based.

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under Title VII and Section 1981.

7. This Court also has supplemental jurisdiction over Plaintiff's related claims arising under Florida law pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper in this district under in that the unlawful employment practice was committed in this district; the relevant employment records are maintained in this district; and the Plaintiff would have worked in this district but for the alleged unlawful employment practice.

9. Defendants has its principal office in this district, and there is no other district that has substantial connection to the claim.

10. On January 11, 2021, Plaintiff timely filed a charge of race discrimination and retaliation with the Florida Commission on Human Relations and the U.S. Equal Employment Opportunity Commission ("EEOC").

11. Ms. Outing attempted mediation with CWI though the EEOC's conciliation services program, but the parties' efforts were unsuccessful.

12. On or about January 23, 2023, the EEOC issued Plaintiff a Notice of Right to Sue. This Complaint has been filed within 90 days of receipt of that notice.

13. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court.

## GENERAL ALLEGATIONS

A. *Employment Discrimination and Retaliation*

14. On February 7, 2000, CWI hired Ms. Outing as a full-time employee with CWI as an Inventory Control Specialist I in the Accounting Department.

15. She was then promoted from an Inventory Control Specialist I to II on January 28, 2019.

16. Ms. Outing received consistent Meets/Exceptional ratings in her performance reviews.

17. At all times relevant, the department to which she was assigned consisted of manager April Griffin, who is white.

18. At all times relevant, the department had two direct reports. The first is Ms. Outing, who is black.

19. Ms. Outing's role of Inventory Control Specialist II was a role that received hourly pay.

20. The second direct report was Roger Workman, who is a white male.

21. Mr. Workman was employed as a Bulk Inventory Analyst. This role receives salary pay.

22. At least as early as January 2019, Ms. Griffin – the supervisor to whom both Mr. Workman and Ms. Outing are responsible – assigned Mr. Workman to train Ms. Outing on several of CWI's inventory accounting systems.

23. Ms. Griffin notified Mr. Workman that training was due to begin on or around Monday, May 6, 2019.

24. On Thursday, May 9, 2019, Ms. Outing notified Mr. Workman that she was available for training on one of the systems that day and the following day.

25. Mr. Workman read and ignored the email.

26. On May 23, 2019, Ms. Outing followed up and asked if he had a specific time when he would like to meet for training.

27. Mr. Workman also read and ignored that email.

28. Ms. Griffin and Brad Fraser, who served as Plant Controller at the time and who was Ms. Griffin's immediate supervisor and a supervisor to whom Ms. Outing reported, decided that Brandon Watkins would work with Mr. Workman on the rest of the reporting.

29. Mr. Watkins is a Cost Accountant who is white and another one of Mr. Fraser's direct reports.

30. As a result of Mr. Workman's avoidance, Ms. Outing was shut out of receiving training on the entire process. CWI acquiesced to Mr. Workman's insubordinate refusal to train a black employee and instead allowed him to train a white employee – all to Ms. Outing's detriment.

31. Around September 2019, Ms. Outing approached both of her managers, Ms. Griffin and Mr. Fraser, to discuss Mr. Workman's failure to provide cross-training as directed.

32. Ms. Griffin was aware of this failure, as she acknowledged that she had directed Ms. Outing to contact another department to watch the process because "it was the only she could get things done."

33. Ms. Griffin and Mr. Fraser directed Ms. Outing to set up a meeting between Ms. Outing, Mr. Workman, and the two of them and add it to Mr. Workman's calendar.

34. Ms. Griffin and Mr. Fraser indicated that they would intentionally not attend the meeting and that would be Ms. Outing's opportunity to receive the training she was entitled to receive.

35. Ms. Outing did not set up the meeting because she believed it was unethical and intentionally deceptive. It was also the responsibility of Ms. Outing's supervisors - not her - to enforce the company's expectations and require Mr. Workman to conduct the training.

36. In or around January 2020, Trace Holloway, a white employee who worked at the time in Inventory Accounting in the same position as Ms. Outing, and Ms. Griffin attended a department meeting with Ms. Outing, Mr. Workman, and Mr. Fraser. Mr. Fraser told Mr. Workman to cross-train Ms. Outing on certain of Mr. Workman's job duties.

37. Mr. Workman claimed he had no time and he did not need any help.

38. Ms. Outing went back to Mr. Fraser and told him that Mr. Workman's refusal remained firm despite Mr. Fraser's directive.

39. Mr. Fraser told Ms. Outing words to the effect of: "You're going to help him whether he wants it or not."

40. The message, however, apparently did not reach Mr. Workman and it certainly did not change his behavior.

41. Mr. Fraser's words also did not align with CWI's actions. Instead of requiring Mr. Workman to meet his obligations, Ms. Outing's supervisors simply tolerated, refused to question, and excused Mr. Workman's repeated avoidance.

42. Indeed, CWI promoted Mr. Workman to the role of Inventory Control Specialist II in April 2020, despite the insubordinate behavior of which they were aware by that point.

43. This promotion occurred in violation of CWI's internal hiring policy. Under its internal hiring policy, it advertised the promotion on a bulletin board announcement that was posted for a short time.

44. Ms. Outing and Mr. Workman were the only employees who were eligible for the promotion in their department.

45. Ms. Outing was working from home due to the COVID-19 pandemic and the health conditions for her and her mother that made her extremely vulnerable to illness.

46. Rather than post the position on the company's Intranet system or send an email announcement to both employees, CWI posted the announcement on a bulletin board, knowing that Ms. Outing could not see it because she was assigned to work from home during this period.

47. Mr. Workman did, in fact, find time to train other employees, all of whom were white. In fact, CWI hired Shalonda Brown, another African American

employee, as a temporary employee (or "temp") to assist Mr. Workman with his workload.

48. CWI began bringing in employees from the Industrial Sales department to assist Mr. Workman in managing a backlog of work that he had failed to complete.

49. Industrial Sales is a related division that handles placing initial orders to purchase products, including domestic and foreign export shipments of produce, namely fruits.

50. Inventory Accounting, however, tracks the inventory for the goods prior to sale. Ms. Brown was an employee in Industrial Sales, along with Paige Kominey, a former employee who was a Commodities Analyst at the time.

51. Ms. Griffin admitted in or around March 2021 that Mr. Workman refused to train Ms. Brown as well.

52. Mr. Workman did, however, agree to train Ms. Kominey, a white employee from the same department.

53. In or around January 2020, Mr. Workman hand-selected Ms. Kominey to receive training. Ms. Kominey's manager, Leila Richards, referred to the task as a "special project" in Inventory Accounting. The "project," however, was to receive the cross-training that CWI had directed Mr. Workman to provide to Ms. Outing for more than a year that he continually refused to provide.

54. In fact, Mr. Workman provided Ms. Kominey training on Procitrus, a system run by a vendor from Mexico that the company utilizes for import juice products. Procitrus is related to both the Bulk Purchased Citrus and Plant Yields systems that Ms. Griffin directed Mr. Workman to cross-train Ms. Outing on a year earlier.

55. When Ms. Kominey began receiving the training, Ms. Outing contacted Mr. Fraser and asked when he would provide her with training.

56. Mr. Fraser never followed up to provide Ms. Outing with the cross-training opportunities she had been promised.

57. Mr. Workman had an antipathy to Ms. Outing, an African-American, that did not apply to other white employees that he did train like Ms. Holloway and Ms. Kominey.

58. CWI tolerated and endorsed this racially discriminatory conduct and indeed elevated Mr. Workman in spite of it.

59. The refusal to train, however, went higher than Mr. Workman at CWI.

60. Ms. Outing was excluded from critical training.

61. During the end of Ms. Outing's employment, CWI began transitioning to a new inventory management system known as Oracle Finance.

62. The Oracle meetings were indeed training for employees in the Inventory Accounting department - Ms. Outing's department - and multiple other departments.

63. On or around February 18, 2020, Ms. Outing learned from Ms. Holloway, her co-worker in the same position in Inventory Accounting at the time, that CWI was holding a training on inventory reports.

64. CWI sent a calendar invitation to dozens of employees for the training.

65. All of the employees who were invited to the training are white or not African American.

66. All of the staff in the Inventory Accounting department were on the email list - except Ms. Outing, who is the only African American employee in that department.

67. Other employees from the other related financial planning departments - Operations Support, Cost Accounting, Information Systems, and Industrial Sales - were also on the email list.

68. Just as Ms. Outing was not allowed to attend the internal inventory reports training in February 2020, CWI management barred her from attending the multiple Oracle trainings for employees.

69. She is also the only Inventory Accounting employee who was not allowed to attend such trainings.

70. In November 2020, CWI sent out an email to employees across the company to attend Oracle Cloud - Phase 2 training, complete with a first-time login. While the company has email lists that include all of the employees in a certain department (for example, an email list simply titled "Operations Support Team"), it chose to send this email directly to specific employees. All of the employees in Inventory Accounting received the email - except Ms. Outing.

71. Ms. Outing was subjected to a hostile work environment, including but not limited to monitoring of other employees coming to her office and efforts to discredit her work and work product.

72. The Oracle training sessions are also critical to the success of Ms. Outing's role. As an example, in February 2021, an employee from a different department asked Ms. Outing to complete an assignment using the Oracle software, but she had to admit that she had not "been given a login, training or access to the program" of it or any related information.

73. It was only at this point that she received login information for a system that she had not been trained to use like her co-workers a week later from CWI's Information Technology (IT) department.

74. CWI's refusal to allow Ms. Outing to attend Oracle Finance system trainings and failing to ensure that Mr. Workman conduct cross-training with Ms. Outing as instructed was an effort to render her position and her employment obsolete.

75. Once the systems which Ms. Outing handled under her position as Bulk Inventory Accounting Specialist I were transferred to Oracle Finance, she would not be able to complete her job successfully because her employer denied her the training it gave to its white employees. If Mr. Workman never provided cross-training to her, as he did for other white employees, she would never learn to master other systems or produce other reports which CWI required her department to produce.

76. If the entire company's accounting/inventory system is switching over to Oracle Finance and CWI never allows Ms. Outing to learn Oracle Finance, she would likely never be eligible for a promotion to Mr. Workman's current role or a higher position in the future.

77. If she had no training on the systems, she would ultimately lose her value to the company and be subject to termination or forced to resign.

78. Rather than risk directly firing the only black employee in the department, CWI simply worked to squeeze her out over time, not unlike the juice from oranges that its growers pick and bottle every day.

*FMLA Leave*

79.     In or around August 2020, Ms. Outing returned from work following a period of FMLA leave.

80.     Upon her return, she began to notice that CWI management was treating her differently than Mr. Workman, her white co-worker.

81.     Ms. Outing or her immediate family members, namely her now deceased mother, had several health challenges during Ms. Outing's employment with CWI.

82.     As a result, Ms. Outing received continuous or intermittent FMLA in 2013, 2016, 2018, 2019, 2020 and 2021.

83.     Around September 2020, Ms. Outing filed a complaint with the U.S. Department of Labor (DOL) alleging violations of the FMLA against CWI. While that investigation did not lead to the issuance of a penalty, CWI took various adverse employment actions against Ms. Outing after the DOL concluded its investigation.

84.     CWI counted FMLA leave time as an absence on multiple occasions.

85.     When Ms. Outing asked to work from home due to the COVID-19 pandemic, the company changed her work hours.

86.     CWI took work off of Ms. Outing's desk after she returned from FMLA leave. By contrast, another employee who had not taken FMLA leave was

behind on work assignments for months and his assignments were never removed.

87. After Ms. Outing returned from FMLA leave, CWI moved up Ms. Outing's deadline to complete work an hour early. So, she only had seven hours to complete tasks while other employes had eight hours.

88. After Ms. Outing returned from FMLA leave, a CWI supervisor threatened to write her up for no reason. When she complained about this threat, CWI claimed that she could not work in the north office building past 6 p.m. – a restriction to which other employees who did not take FMLA leave were not subject.

89. After Ms. Outing returned from FMLA leave, CWI accused her of timecard fraud for taking her mother to dialysis training when Ms. Outing was out on FMLA leave as a caregiver.

90. CWI demanded proof of her leave and Ms. Outing was forced to send private photos with her and her mother at dialysis training to prove that she had been out on FMLA leave, even though the demand for the photos violated the privacy rights of Ms. Outing and the person to whom she was providing care.

91. Ms. Outing was ultimately forced to leave her employment due to a hostile work environment and the combination of the factors alleged in the complaint.

## COUNT I
## Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964

92. Plaintiff restates the allegations in paragraphs 1 through 78 as if fully set forth herein.

93. Plaintiff is African American. Therefore, she belongs to a protected class under the statute.

94. Plaintiff raises a claim for the failure to train and the failure to promote.

95. Plaintiff suffered adverse employment actions because of the refusal to provide training on race neutral terms to Plaintiff by CWI and its employees.

96. Individuals who were not in the protected class received the training to which Ms. Outing was entitled.

97. Plaintiff was also qualified for a promotion.

98. Likewise, the failure to promote on race neutral terms constitutes an adverse employment action.

99. Mr. Workman, a white employee, was treated more favorably than Ms. Outing, a black employee with respect to the opportunity to compete for the relevant promotion.

100. Plaintiff suffered damages as a result of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs and attorney's fees of bringing this action.

101. Defendants intentionally violated Plaintiff's rights under Title VII, with malice or reckless indifference, and, as a result, are liable jointly and severally for punitive damages.

## COUNT II
## Violation of 42 U.S.C. § 1981

102. Plaintiff restates the allegations in paragraphs 1 through 78 as if fully set forth herein.

103. Section 1981 provides for the right to "make and enforce contracts" on the same terms "as is enjoyed by white citizens." These contracts include contracts for employment.

104. Plaintiff raises a claim for the failure to train and the failure to promote.

105. Plaintiff suffered adverse employment actions because of the refusal to provide training on race neutral terms to Plaintiff by CWI and its employees.

106. Individuals who were not in the protected class received the training to which Ms. Outing was entitled.

107. Plaintiff was also qualified for a promotion.

108. Likewise, the failure to promote on race neutral terms constitutes an adverse employment action.

109. Mr. Workman, a white employee, was treated more favorably than Ms. Outing, a black employee with respect to the opportunity to compete for the relevant promotion.

110. Plaintiff suffered damages as a result of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs and attorney's fees of bringing this action.

111. Defendants intentionally violated Plaintiff's rights under Section 1981, with malice or reckless indifference, and, as a result, are liable jointly and severally for punitive damages.

## COUNT III
## Violation of the Florida Civil Rights Act

112. Plaintiff restates the allegations in paragraphs 1 through 78 as if fully set forth herein.

113. Defendants have engaged in race discrimination in violation of Fla. Stat. § 760.01 to 760.11.

114. Plaintiff raises a claim for the failure to train and the failure to promote.

115. Plaintiff suffered adverse employment actions because of the refusal to provide training on race neutral terms to Plaintiff by CWI and its employees.

116. Individuals who were not in the protected class received the training to which Ms. Outing was entitled.

117. Plaintiff was also qualified for a promotion.

118. Likewise, the failure to promote on race neutral terms constitutes an adverse employment action.

119. Mr. Workman, a white employee, was treated more favorably than Ms. Outing, a black employee with respect to the opportunity to compete for the relevant promotion.

120. As a direct and proximate result of Defendants' violation of the Florida Civil Rights Act, Plaintiff has suffered lost wages and benefits, severe emotional distress, suffering, inconvenience, mental anguish and non-pecuniary losses.

121. Plaintiff respectfully requests a jury trial on all issues and relief as follows:

    a. Compensation for all compensatory damages allowed by law;

    b. Compensation for punitive damages allowed by law;

    c. Payment for the loss of future wages;

    d. An award of reasonable attorney's fees and costs;

    e. Interest; and

    f.  Such other additional equitable and legal relief as may be just and proper.

## COUNT V
## Violation of the Family and Medical Leave Act

122. Plaintiff restates the allegations in paragraphs 1 through 9, and 79 through 91 as if fully set forth herein.

123. Plaintiff is an FMLA-eligible employee.

124. Plaintiff was qualified for her position and performed her job duties effectively prior to the acts complained of herein.

125. Plaintiff suffered an adverse employment action in that she was subjected to the adverse actions alleged herein.

126. Defendants' disparate treatment of Plaintiff began within a short timeframe after Plaintiff returned to work from FMLA leave on multiple occasions.

127. Defendants engaged in prohibited conduct under the FMLA by interfering with, restraining, or denying her rights provided under the Act.

128. As a result of Defendants' wrongful acts and omissions, Ms. Outing has suffered and continues to suffer substantial losses, including expenses related to medical treatment, as well as past and future lost wages and benefits. Plaintiff is also entitled to liquidated damages, attorneys' fees and costs, and other damages as recoverable by law.

## DEMAND FOR JURY TRAIL

Plaintiffs demand a jury trial for all issues so triable.

**Dated:** April 21, 2023

*Respectfully submitted,*

*/s/ Jade A. Craig*
**JADE A. CRAIG, Esq.**
Florida Bar No. 121805
Primary email: jadecraig@gmail.com
Secondary email:
jade@jadeacraigpa.com
Jade A. Craig, P.A.
1313 NE 3rd Street
Fort Lauderdale, Florida 33301
Telephone: (813) 459-1309

*/s/ Karmika v. Rubin*
KARMIKA V. RUBIN
Florida Bar No. 0075098
Primary email:
epleadings@rubinslaw.com
Secondary email:
Krubin@rubinslaw.com
The Law Office of K. V. Rubin, P.A.
111 Second Avenue NE, Ste. 341
St. Petersburg, Florida 33701
Telephone: (727) 512-8261
Facsimile: (727) 231-0946

*REMAINING SPACE INTENTIONALLY LEFT BLANK*